IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

A.G.K. SARL                 :      CIVIL ACTION
                            :
        v.                  :
                            :
A.M. TODD COMPANY, et al.    :      NO. 07-2727


<u>MEMORANDUM AND ORDER</u>

McLaughlin, J.                              March 18, 2008


        The plaintiff has filed suit on contract and non-
contract grounds against the defendants, two corporations and an
individual.  The plaintiff alleges that it shipped vanilla beans
to the defendants or one of the corporate defendants'
subsidiaries in early 2004, but neither the defendants nor the
subsidiary ever paid for the beans.  In 2005, the plaintiff filed
an arbitration proceeding against the subsidiary.  The plaintiff
claimed that it and the subsidiary had a contract for the sale of
vanilla that included an arbitration clause.  The plaintiff
withdrew from the arbitration proceeding in February 2007, just
before the final hearing was scheduled to occur, citing concerns
that the subsidiary was judgment-proof and a sham corporation.  A
few months after the arbitration proceeding terminated, the
plaintiff brought this suit.

        This suit seeks to hold the defendants liable in three
distinct ways:  first, the plaintiff alleges that the corporate

veil of the subsidiary should be pierced to hold the defendants liable for the subsidiary's liabilities;[1] second, the plaintiff alleges that one or more of these defendants are directly liable as parties to the contract with the plaintiff; and third, the plaintiff alleges that the defendants are directly liable under two non-contract theories - conversion and unjust enrichment. Under all of these theories, the plaintiff seeks to pierce the corporate veil of one of the corporate defendants in order to hold the other two defendants liable.

The defendants have filed a Motion to Dismiss, or in the Alternative to Change Venue.  The defendants argue that the plaintiff is estopped from filing suit here and from taking various factual positions here because it previously brought and abandoned arbitration proceedings in which it took contrary positions.  They argue further that this Court lacks jurisdiction over this dispute because of the arbitration clause. Additionally, the motion argues that the plaintiff does not plead piercing the corporate veil with enough specificity, and that

---

[1]    The plaintiff alleges both a corporate-veil-piercing theory and an alter ego theory.  This Court has recognized that these theories, though similar, are not identical.  Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519, 524 & n.3 (E.D. Pa. 2005).  The distinctions between these two theories are not material to the Court's decision here.  The Court will therefore sometimes refer to piercing the corporate veil when it also means to include the plaintiff's alter ego theories.

venue is proper only in the Southern District of New York because New York was the agreed-upon situs of the arbitration and would be the location of any appeal from an arbitration judgment.  The Court will grant the motion.  The Court finds that all matters in this suit are arbitrable, but it will stay, rather than dismiss, the case.

        The plaintiff consented to arbitrate its claims when it brought and prosecuted the arbitration proceeding against the defendants' subsidiary.  Although the defendants did not sign the arbitration agreement, they have standing to enforce the arbitration agreement against the plaintiff.  The plaintiff cannot bring any claims here that purport to pierce the subsidiary's veil, before it first establishes the subsidiary's liability in arbitration.  To the extent that the plaintiff tries to hold the defendants directly liable under the contract that includes the arbitration clause, the plaintiff must arbitrate such claims.  Finally, under the liberal federal policy favoring arbitration, the Court finds that the scope of the plaintiff's consent to arbitrate is broad enough to cover all of the claims that the plaintiff raises here, even its non-contract claims, because the factual allegations necessary to prove these claims are so intertwined with one another.  Having found the claims in this suit arbitrable, the Court stays these proceedings pending arbitration.

I.    Facts

    A.    Legal Standard

        A motion to stay a suit in favor of arbitration is treated as a motion for summary judgment because the Court must decide the question of whether the parties have agreed to submit the dispute to arbitration.  Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 & n.9 (3d Cir. 1980).  Although the defendants do not ask this Court to compel arbitration, they do ask this Court to find that this suit was improperly brought because the plaintiff's claims are subject to binding arbitration.  Tr. Oral Arg. at 34, 56-57.  The summary judgment standard, therefore, applies to the present motion.  The Court will view the facts in the light most favorable to the plaintiff.[2]

        Parts of the Court's decision rest on the relationship between the plaintiff's claims and the arbitration clause that the Court rules is applicable.  The Court has relied on the complaint in construing the relationship between the plaintiff's claims and the arbitration clause.  The determination does not rely on any facts that are in dispute.

---

      [2]    On a motion for summary judgment, a court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment is proper if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The Court draws the following facts from three sources: the complaint, the papers filed in the earlier arbitration, and the parties' papers regarding the motion to dismiss.  The Court will not set forth all of the details of the parties' dealings because many are not relevant to the disposition of the present motion.

B.    The Complaint

The plaintiff, A.G.K. Sarl ("AGK"), is a vanilla bean exporting company based in the Comoros, an island nation located between Madagascar and mainland Africa.  AGK is owned and directed by Amine Kalfane, a citizen of the Comoros.  Defendant A.M. Todd Company ("A.M. Todd") is a Michigan company, while defendant Zink and Triest Company ("ZTC") is a Delaware corporation and has its principal place of business in Montgomeryville, Pennsylvania.  Defendant Henry W. Todd, Jr. ("Todd"), a citizen of Pennsylvania, is a director of ZTC and of A.M. Todd.  The corporate defendants are engaged in the food additives and flavorings business.  Compl. ¶¶ 1-4.

The defendants began purchasing large quantities of vanilla from the plaintiff in the 1990s.  AGK would act as purchasing agent for the defendants, with ZTC always serving as the consignee on the contract.  ZTC frequently provided down payments to AGK to finance vanilla production.  By 1996, ZTC was

buying nearly all of AGK's vanilla output.  Compl. ¶¶ 6-9.

In the fall of 2003, AGK and the defendants entered into an agreement that AGK would sell a large quantity of vanilla to the defendants.  Todd urged AGK to buy up as much vanilla as possible – more than AGK would have otherwise.  In September 2003, the defendants advanced $3 million to AGK toward its 2003 vanilla crop.  AGK borrowed a large additional sum in order to procure as much vanilla as possible.  Todd told AGK that, because of global vanilla shortages, the price for vanilla would be $575 per kilogram for high quality vanilla.  AGK sold all of its vanilla output to the defendants, turning down several other offers to buy its vanilla.  Nearly all of the defendants' correspondence with AGK was on ZTC letterhead.  Compl. ¶¶ 11-12, 14-16, 18, 20.

The parties reached agreement on all significant terms of the sale by the end of 2003.  One shipment of vanilla was to include 17 tons of vanilla beans at a cost of $570 per kilogram ("Tranche 1").  The remaining vanilla was to be sold on consignment, with ZTC negotiating the best price possible with the ultimate customer, between $500 and $510 per kilogram.  This remaining vanilla included a shipment of more than six tons ("Tranche 2") and several additional shipments of about 6.5 tons ("the airway bills").  Compl. ¶ 22.

The defendants created Zink and Triest International

("ZTI") before 2001 to be the nominal buyer in such vanilla contracts.  ZTI is an "offshore" "dummy" corporation organized under the laws of Mauritius.  It is a wholly owned subsidiary of one or more of the defendants.  At all relevant times, ZTI had no existence apart from the defendants, was grossly undercapitalized, did not engage in arms-length transactions or corporate formalities, and was operated by the defendants "solely as a shell, artifice and façade with the attempted purpose of unjustly limiting Defendants' exposure in contracts with foreign parties."  Compl. ¶¶ 23-25.

On January 14, 2004, after AGK had finished acquiring, preparing, packing, and readying the vanilla for shipment, it received a document ("Contract 11204") on ZTI letterhead, signed by Todd on behalf of ZTI.  ZTC is listed as the consignee.[3] Contract 11204 "memorializes some of the terms of the agreement the parties had previously reached, and unilaterally claims to modify other terms, such as payment and acceptance terms."  AGK did not sign the document and used it only as a formality for customs purposes.  Contract 11204 specifies the quantity and price of the beans to be sold.  Tranche 1, weighing 17,750.05 kilograms, would be sold for $570 per kilogram.  Tranche 2,

---

[3]     The complaint states that "the insurance clause refers to Zink and Triest [ZTC] as the buyer," but this characterization is inaccurate.  Contract 11204 refers to ZTI as the buyer. Compl. ¶ 30; Ex. A to the Compl.

weighing 6,975.15 kilograms, would be sold at a price to be determined.  The document recites that payment for Tranche 1, less the $3 million advance, will be due "immediately upon payment by Z & T's customer."  Tranche 2 is specified to be on consignment.  Compl. ¶ 28-30.[4]

The defendants had approved samples of the vanilla that was sent in Tranche 1 and Tranche 2.  The beans left the Comoros on January 14, 2004, and arrived in Philadelphia on January 15, 2004.  The market price for vanilla was dropping as the beans arrived in Philadelphia.  Although it is industry standard for the consignee or buyer to notify the seller within two to three days of any problems with a shipment, ZTC did not mention any problem with the quality of Tranche 1 until eight weeks later on March 9, 2004, one day after a cyclone in Madagascar destroyed a large portion of ZTC's stock and caused liquidity problems for ZTC.  Compl. ¶¶ 32-34, 39, 47-49.

Unbeknownst to AGK at the time, the ultimate customer for the vanilla was Coca-Cola, which had tested and approved samples of the beans.  The defendants unilaterally gave Coca-Cola extra time to inspect the beans.  Even after ZTC expressed concerns about the quality of the beans, ZTC sent AGK additional

---

[4]     AGK attaches a copy of Contract 11204 as Exhibit A to its complaint.  The complaint does not, however, mention the arbitration clause, the contents of which the Court will discuss in Section I.C. below.

payments in April 2004 totaling $1.7 million.  ZTC's CFO, Brian Scott, e-mailed AGK indicating that the defendants intended to pay the balance owed.  Compl. ¶¶ 44, 45, 50, 53-55.

AGK sent Tranche 2 to the defendants on January 29, 2004, and it arrived in Philadelphia on January 30, 2004.  On or about February 6, 2004, the plaintiff sent the defendants two shipments on consignment.  These shipments, known as the airway bills, were listed as AWB 1473878 (2,149 kilograms of vanilla) and AWB 90134704 (4,400 kilograms of vanilla).  The parties had agreed that these shipments would be treated in the same manner as Tranche 2, that is, to be sold on consignment for at least $500 per kilogram.  On February 24, 2004, the defendants informed AGK that these three shipments required "restorative measures" in order to be suitable for sale.  AGK agreed to these measures. Compl. ¶¶ 41, 42, 46.

The defendants ultimately claimed that Coca-Cola had rejected the shipment.  The defendants never paid for any of the vanilla beyond the advances described above.  They kept the beans and asserted that they were attempting to mitigate damages by mixing the beans that AGK had shipped with other beans, and then selling the mixture.  Compl. ¶¶ 56, 57.

As of April 2005, ZTC is no longer operating.  A.M. Todd has taken over all of its accounts and functions.  As of April 8, 2005, all payments for vanilla bought from ZTC were to

be made to A.M. Todd.  Compl. ¶ 58.

AGK advances three types of claims.  Counts 1, 2, and 3 refer to Tranche 1, while counts 4, 5, and 6 refer to the three subsequent shipments, Tranche 2 and the airway bills.

First, counts 1 and 4 contend that the parties had an oral contract, partially memorialized by certain faxes, that the defendants breached.[5]  The parties had agreed that the defendants would purchase all of the plaintiff's 2003 vanilla output.  AGK repeats its earlier contention that Contract 11204 incorporated some of the parties' agreed-upon terms but unilaterally changed others, especially payment terms.  AGK reiterates that the defendants had a duty to inspect and reject the vanilla promptly if it were defective.  Compl. ¶¶ 60-63, 86-99.

Second, counts 2 and 5 claim that if Contract 11204 was a valid contract, then the defendants breached that contract. The defendants had a duty to inspect and reject the vanilla promptly if it were defective.  Once they accepted the beans but refused to pay for them, the defendants converted the beans to their own use.  If the beans were not defective on arrival but later became defective, then the defendants breached their duty

---

[5]    The complaint does not mention ZTI in the counts praying for relief, instead referring mostly to "Defendants" and occasionally to "Zink and Triest" (what the Court has called ZTC).  AGK acknowledged in its brief and at oral argument, however, that proving ZTI's liability may be necessary for some of its claims.  Pl's Br. at 34-36; Tr. Oral Arg. at 38-39.

by failing to store the vanilla properly and/or by unilaterally giving Coca-Cola extra time to test the product.  If the beans were never defective, then AGK should not have had to bear the risk that Coca-Cola would reject the beans solely to get a better price elsewhere.  The plaintiff emphasized at oral argument that it asserts that ZTC is directly liable to AGK as the consignee in Contract 11204.  Compl. ¶¶ 67-71, 103-09; Tr. Oral Arg. at 21-22.

Finally, counts 3 and 6 allege that, if the Court finds no contract, then the defendants have been unjustly enriched because AGK acquired a large amount of vanilla at the defendants' behest and as their purchasing agent, and the defendants retained the vanilla that AGK shipped.  The defendants had a duty to inspect and reject the vanilla promptly if it were defective. Instead, they have retained the vanilla and have not paid for it. Compl. ¶¶ 75-82, 113-20.

On all counts, the plaintiff argues that the defendants should be treated as a single entity or ZTC's veil should be pierced to hold A.M. Todd and Todd liable.  Compl. ¶¶ 64-65, 72-73, 83-84, 100-01, 110-11, 121-22.


C.   The Arbitration

On March 10, 2005, AGK brought an arbitration proceeding against ZTI before the International Division of the American Arbitration Association ("AAA") in New York, demanding

more than $23.6 million in compensatory damages plus punitive damages.  The arbitration complaint invoked the arbitration clause in Contract 11204:  "[i]n the event of disputes Arbitration Rules of the American Arbitration Association in New York will apply."  ZTI brought a counterclaim for the $4.7 million that it had advanced to AGK, plus certain additional costs.  Ex. A at cover page, 2, 62; Ex. B; Ex. MM at 9-10.[6]

In early 2006, AGK attempted to join the defendants as respondents in the arbitration, arguing that ZTI's corporate veil should be pierced.  ZTI opposed the joinder of these additional parties, arguing that the defendants were separate from ZTI and were not signatories to the contract.  On July 6, 2006, the arbitrators issued a Partial Award denying AGK's request because joining new parties so late in the proceedings would unfairly deny those parties the opportunity to participate in choosing the arbitrators and the rules of the arbitration.  The arbitrators explicitly did not rule on the merits of whether the arbitration panel would have jurisdiction over the defendants or on whether the corporate veil should be pierced to hold the defendants liable for ZTI's debts.  The arbitrators did suggest that AGK could bring a separate arbitration proceeding against the

---

[6]     Unless otherwise noted, references to lettered exhibits refer to exhibits to the defendants' motion.  References to numbered exhibits refer to exhibits to the plaintiff's opposition.

defendants to resolve these issues.  Ex. GG; Ex. HH; Ex. FF; Ex. OO.

On February 2, 2007, the plaintiff sent a letter to the arbitration panel and to ZTI, stating that it had resolved to withdraw from the arbitration because it had discovered that ZTI was judgment-proof and a shell corporation.  The letter states that Todd had contacted AGK urging it to drop the suit because ZTI had no assets.  AGK also states that any judgment against ZTI will be unenforceable because ZTI no longer exists.  In the face of AGK's withdrawal, ZTI dropped its counterclaim.  The arbitrators terminated the arbitration proceeding on February 28, 2007.  A final oral hearing had been scheduled for February 26, 2007.  The parties agreed at oral argument that the termination was without prejudice.  Ex. W; Pl's Ex. 3 distributed at oral arg.; Ex. BB; Tr. Oral Arg. at 20-21, 43.

D.   The Defendants' Motion to Dismiss and the Plaintiff's Opposition

In their motion to dismiss, the defendants argue that the Court should dismiss the plaintiff's complaint because:  (1) AGK is judicially estopped from arguing that the arbitration clause does not govern the parties' transaction because AGK brought and for two years participated in arbitration; (2) the Court lacks subject matter jurisdiction because the arbitration clause is valid; (3) the complaint's allegations of veil-piercing

are insufficient; and (4) venue is improper.  In the alternative, the defendants argue that (5) the Court should stay these proceedings until AGK obtains an arbitration award against ZTI; (6) the Court should transfer these proceedings to the Southern District of New York; or (7) AGK should be required to plead more specifically.  Def's Br. at 4.

The plaintiff opposes each of these positions, arguing that it may go forward with all of its claims.  AGK argues that it is not estopped from pleading in the alternative and states that it may proceed against the defendants notwithstanding its prior arbitration against ZTI.  It calls that arbitration a "mistake."  Pl's Br. at 29, 34.

A few additional relevant facts came to light as part of the parties' motion papers.  In particular, AGK provided documents that explain further why it withdrew from the arbitration proceeding.  The defendants deny the conclusion that ZTI was, in fact, judgment-proof or a shell corporation at the relevant times.  They do not dispute, however, that the following events occurred.

After filing the arbitration, AGK's counsel, Eric Sossah, a French attorney, investigated ZTI's finances and corporate information.  As a result of this investigation, which included traveling to Mauritius, Sossah concluded that ZTI was a "nameplate" company, with no physical presence apart from a

corporate depository that provided a Mauritius mailing address. Aff. of Eric Sossah, Ex. 20, ¶¶ 8-16, 21.

To substantiate its position that ZTI was judgment-proof by the time the arbitration terminated, the plaintiff submitted an e-mail from ZTI's counsel (also defense counsel here) to AGK's counsel stating that ZTI's "assets . . . are dwindling rapidly and its cash balances are approaching absolute zero."  The exhibit does not appear to contain the date of the e-mail, but the plaintiff's brief represents that the e-mail was sent on November 29, 2006.  Ex. 17.

## II.  Discussion

The Court's decision proceeds in seven parts, holding that:  (1) the framework of the Federal Arbitration Act ("FAA") applies to this case; (2) AGK has demonstrated its consent to arbitrate at least its claims against ZTI by bringing the AAA proceeding; (3) the defendants can enforce AGK's agreement to arbitrate against AGK; (4) because AGK's claims against ZTI are arbitrable, any claims that purport to pierce ZTI's veil are likewise arbitrable; (5) any claims that rely specifically on Contract 11204, whether pleading that it is the governing contract or that it memorializes some but not all of the parties' intentions, are arbitrable; (6) the plaintiff's claims for unjust enrichment and conversion, brought against the defendants

directly, must be sent to arbitration because they plausibly relate to the subject matter of the agreement to arbitrate; and (7) the FAA requires the Court to stay the case.

    A.    <u>The Federal Arbitration Act</u>

        The FAA, 9 U.S.C. §§ 1-16, governs all contracts that rely on a written arbitration clause and concern interstate or foreign commerce.  9 U.S.C. §§ 1, 2.  If a court finds that a given dispute falls under a valid arbitration clause, then the court must stay court proceedings pending arbitration (9 U.S.C. § 3) and compel arbitration (9 U.S.C. § 4) if a party requests such relief.

        Under the FAA, questions of whether the parties formed an agreement to arbitrate at all are governed by state contract law.  <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 945 (1995).  "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  <u>AT & T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 648 (1986) (internal quotations omitted).  The FAA mandates that the arbitration clause is valid and enforceable to the same extent that any other contractual provision would be. An arbitration clause cannot be invalidated except on the basis of generally applicable contract principles, such as fraud or unconscionability.  9 U.S.C. § 2; <u>see also</u> <u>Doctor's Assocs., Inc.</u>

16

v. Casarotto, 517 U.S. 681, 687 (1996) ("By enacting § 2, . . . Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed upon the same footing as other contracts." (internal quotations omitted)).[7]

Once it is established that an arbitration clause exists and that the FAA applies, federal law governs the scope of an arbitration clause.  The FAA embodies a liberal policy favoring arbitration.  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983).  Any ambiguity as to whether a particular grievance falls within the ambit of an arbitration clause must be resolved in favor of arbitration.  AT & T, 475 U.S. at 650.  "An order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  So long as a party's claim of arbitrability is "plausible," an arbitrator, not a court, must interpret the contract.  Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 55 (3d Cir. 2001)

---

[7]     If the party challenges the arbitration clause in particular - not the contract as a whole - on the basis of such a principle, then the court can decide the clause's validity.  In contrast, if the party challenges the contract as a whole on the basis of such a principle, then the court must not decide the question but must instead submit the issue to the arbitrator. Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 (2006); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967).

(internal quotations omitted).

The FAA applies to the present facts.  The parties do not directly address whether the FAA applies.  The plaintiff does not mention the FAA in its brief at all, while the defendants refer to it only in passing.  The Court finds, however, that both FAA requirements have been met.  First, the arbitration clause in Contract 11204 is written.  The fact that Contract 11204 was never signed by AGK does not remove the contract from the FAA's ambit.  The FAA does not require a signature.  See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987).[8]  Second, no one disputes that the transaction at issue is international, with the vanilla beans shipped from the Comoros to Philadelphia.

B.   AGK Agreed to Arbitrate Its Claims By Bringing the AAA Arbitration

Ordinarily, the Court would engage in an inquiry into whether Contract 11204 satisfied the contract principles of offer, acceptance, meeting of the minds, and so forth.[9]

---

[8]   Where lawmakers have wished to indicate that a law applies only when the contract with the arbitration clause has been signed, they have done so explicitly.  See Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 448-49 (3d Cir. 2003) (holding that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which has been incorporated into U.S. law, is applicable only when both parties have signed a contract or series of letters agreeing to arbitration).

[9]   The parties disagree about which state's law should apply, but neither points out a relevant difference between Pennsylvania law (favored by the plaintiff) and New York law

AGK argues that it never agreed to arbitrate any disputes with ZTI or the defendants because it never agreed to Contract 11204. It does not argue that the arbitration clause specifically is invalid. Instead, it argues that it never agreed to several key terms in Contract 11204, that its shipment of the vanilla beans did not constitute acceptance of Contract 11204, and therefore that Contract 11204 did not represent the parties' true agreement.

In this case, however, the Court need not conduct an inquiry into whether or not Contract 11204 was validly formed because AGK manifested its consent to arbitrate by bringing the AAA arbitration.  Although a party usually indicates its intent to arbitrate by signing a contract that includes an arbitration clause, it can also indicate its consent by bringing and prosecuting an arbitration proceeding.  A party may also waive any objection to arbitration by not raising it early enough. United Indus. Workers, Local No. 16 v. Gov't of the V.I., 987 F.2d 162 (3d Cir. 1993).

In United Industrial Workers, the United States Court of Appeals for the Third Circuit held that by demanding arbitration and fully participating in arbitration, represented

---

(favored by the defendants).  Both parties freely cite to federal cases applying federal law, as well.  New York and Pennsylvania law both support the Court's ruling, which is based on generally applicable principles of consent and waiver.  Therefore, the Court does not conduct a choice of law analysis.

by counsel, the plaintiff union demonstrated its unmistakable intent to arbitrate the dispute.  Id. at 168.  The court went on to cite approvingly a case from the United States Court of Appeals for the Seventh Circuit that stated that "[t]he party initiating the arbitration has made a decision that the dispute is arbitrable."  Id. (citing Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 1777 v. Fansteel, Inc., 900 F.2d 1005, 1009 (7th Cir. 1990)).  The United Industrial Workers court noted that its decision to hold the union to the arbitration clause could also be understood as stating that the union had waived any right to object to arbitration.  The court cited other circuits approvingly for the proposition that by submitting a matter to arbitration, a party waives the right to object to the arbitrability of a dispute.  United Indus. Workers, 987 F.2d at 168-69.

This common sense principle finds support in both New York and Pennsylvania state law.  In Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chan, 832 N.Y.S.2d 182, 183 (N.Y. App. Div. 2007), the respondent challenged the results of an arbitration on the grounds that the arbitrator lacked authority to hear the case.  The court rejected this challenge because the respondent had himself brought the arbitration proceeding.

In Weinmann v. Meehan, 631 A.2d 684 (Pa. Super. 1993), the appellants argued that the arbitration award against them was

invalid because they, as directors and not shareholders of the corporation at issue, did not fall within the relevant arbitration clause.  Stating that "the parties by their conduct may assent to have a matter resolved by a particular tribunal," the court held that the appellants could not challenge the arbitration because when the appellee had previously brought suit in court, the appellants had successfully argued that the matter was arbitrable.  Id. at 686; cf. 42 Pa. Cons. Stat. § 7314(a)(1)(v) (in statutory arbitration scheme, the court shall vacate an arbitration award where there was no agreement to arbitrate, no court had previously stayed litigation or compelled arbitration, and the party asking the court to vacate the order had raised the issue of an agreement to arbitrate before the arbitrators).

Having brought an arbitration proceeding against ZTI and prosecuted that action for two years, AGK has manifested its consent to arbitrate those claims.  It is immaterial that the above cited cases, unlike the instant case, concern motions to vacate a final arbitration judgment.  In all cases, the central question is whether the party opposing arbitration has already expressed its consent to arbitrate.  The instant case squarely implicates the policy rationales behind United Industrial Workers, Merrill Lynch, and Weinmann, as well as an earlier, similar case, Teamsters Local Union No. 764 v. J.H. Merritt &

21

Co., 770 F.2d 40, 42 (3d Cir. 1985).  To allow a party to bring arbitration, abandon it just before its conclusion - no matter for what reason - and then bring federal suit arguing that no valid arbitration clause existed would introduce unfair and inefficient incentives.

AGK is therefore estopped from asserting that it did not agree to arbitrate.  Alternatively formulated, AGK has waived any objection to arbitration on the grounds that it did not consent.  Whether or not bringing the arbitration was a "mistake," as AGK now states, is immaterial under the framework of United Industrial Workers.  Instead, it is the act of bringing and prosecuting the arbitration - regardless of motivation - that manifests the plaintiff's consent to arbitration and therefore binds the plaintiff to arbitrate.

The extraordinary remedy of judicial estoppel, in contrast, is not applicable here.  Judicial estoppel is an equitable doctrine intended to protect the integrity of the judicial process by preventing parties from deliberately changing positions according to the exigencies of the moment.  It should be applied only to prevent a miscarriage of justice, and the court must give the accused party a chance to explain the inconsistency in its positions.  Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319-20 (3d Cir. 2003).

"[S]ome aggravating factor, and not mere inconsistency, is necessary for the application of judicial estoppel." Chao v. Roy's Const., Inc., --- F.3d ----, 2008 WL 540245, at *11 n.5 (3d Cir. Feb. 29, 2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 751 (2001)) (internal quotations omitted).

Several factors play a role in a court's determination of whether judicial estoppel is appropriate. First, a party's later position must be clearly inconsistent with its earlier position. Second, courts inquire whether the party has persuaded the earlier court to adopt that party's earlier position. Third, courts inquire whether the party seeking to assert the inconsistent position would gain an unfair advantage if not estopped. The court may also consider other factors in balancing the equities, for instance, whether the initial position was a mistake. New Hampshire, 532 U.S. at 749-51, 753 (internal citations omitted); see also Montrose Med. Group Participating Savings Plan v. Bulger, 243 F.3d 773, 780-81 (3d Cir. 2001). The United States Court of Appeals for the Third Circuit has held that the presence of bad faith is relevant to the court's determination. Krystal, 337 F.3d at 319-20.

In view of these factors and on this record, the Court cannot find that AGK has abused the judicial process. The arbitration panel never adopted the claims to which the defendants seek here to bind the plaintiff. Although the

arbitration panel issued interim rulings that may have accepted certain of the positions that the plaintiff took in that proceeding, the panel never reached the merits of AGK's claims against ZTI and therefore did not accept or adopt those theories of liability.

      C.    <u>The Defendants Can Enforce AGK's Agreement to Arbitrate</u>

Although they were not signatories to the arbitration agreement, the defendants can enforce the arbitration agreement against AGK.  Under certain circumstances, a nonsignatory to an arbitration agreement can enforce that agreement against a signatory.[10]  This is so despite the fact that arbitrability is a matter of contract, ordinarily resting on the agreement of the parties.

The United States Court of Appeals for the Third Circuit has noted with approval that courts have bound a signatory to arbitrate with a nonsignatory "at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and

---

[10]     AGK protests that it is not a "signatory" because it never signed Contract 11204.  The Court has found, however, that AGK consented to arbitrate by bringing the arbitration proceeding, so AGK is a signatory for purposes of this analysis, in that it is a party that directly agreed to arbitrate.

intertwined with the underlying contract obligations." E.I.
DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin
Intermediates, S.A.S., 269 F.3d 187, 199-200 (3d Cir. 2001)
(internal quotations omitted).  On this theory, the signatory is
estopped from avoiding arbitration with a nonsignatory when the
claims at issue rely on the terms of the agreement or assume the
existence of, arise out of, or relate directly to, the written
agreement.  Bannett v. Hankin, 331 F. Supp. 2d 354, 359-60 (E.D.
Pa. 2004) (citing Grigson v. Creative Artists Agency, L.L.C., 210
F.3d 524 (5th Cir. 2000); MS Dealer Serv. Corp. v. Franklin, 177
F.3d 942, 947 (11th Cir. 1999); McBro Planning & Dev. Co. v.
Triangle Elec. Const. Co., Inc., 741 F.2d 342 (11th Cir. 1984);
Domke on Commercial Arbitration § 13:8 (2003)).

　　　　Estoppel may also apply where the nonsignatory is
alleged to have engaged in "substantially interdependent and
concerted misconduct" with a signatory other than the plaintiff.
Grigson, 210 F.3d at 527 (quoting MS Dealer, 177 F.3d at 947).

　　　　Here, nearly all of the factual allegations supporting
the plaintiff's claims are allegations that AGK would have had to
have proven in the arbitration in order to prevail against ZTI.
In particular, the allegations of wrong-doing are nearly
identical.  Only the allegations of the corporate relationships
among the defendants and ZTI and of the identities of the parties
that formed the contract would have been inapplicable to the

25

arbitration proceeding.  In fact, AGK attempted to put those relationships at issue even after the arbitration panel ruled against the joinder of the defendants.  Ex. PP.

The second test for applying estoppel is also satisfied.  To the extent that ZTI has some existence separate from the defendants, AGK alleges "substantially interdependent and concerted misconduct" among ZTI and the defendants.

This suit presents the unusual circumstances that the parties seeking to enforce the arbitration agreement have not conceded that the claims against them are arbitrable and that the subsidiary of those parties in fact argued in arbitration that those parties were not subject to the arbitration clause.  These facts do not change the Court's conclusions that the plaintiff has agreed to arbitration and that the defendants have standing to enforce that agreement.  They do, however, raise interesting issues for resolution in the first instance by the arbitration panel.  The Court does not express any view as to any issues other than those decided here.

D.   AGK Cannot Sue on a Piercing the Veil Theory Without First Arbitrating ZTI's Liability

The Court finds that if a party has an arbitration agreement with a subsidiary, that party cannot sue the subsidiary's parent in federal court on a piercing the veil theory without first obtaining an arbitration judgment that the

subsidiary is liable.[11]  As a result, all of the plaintiff's claims that rely on piercing ZTI's veil are arbitrable, in whatever counts of the complaint they appear.

When the plaintiff is obligated to arbitrate its disputes with a subsidiary, allowing the plaintiff to sue the parent directly would allow the plaintiff to bypass the requirement that arbitrators, not a court, rule on whether the subsidiary is liable.  This outcome would frustrate the federal policy favoring arbitration.[12]

The parties cite several cases in their briefs and in oral argument regarding whether a party can sue a parent under a

---

[11]    To the extent that AGK is correct that ZTI has no separate corporate existence apart from the defendants, AGK could be said to be contending that its contractual partners were really the defendants all along.  If that were so, then the defendants would be parties to Contract 11204 and therefore to the arbitration clause.

[12]    Case law supports the analogous proposition that, in the interest of avoiding inconsistent legal determinations, a court may stay non-arbitrable claims against a parent so that arbitrable claims against the subsidiary may be arbitrated first. As the Supreme Court has stated, the trial court has discretion to issue a stay as to a litigant that is not a party to an arbitration agreement.  Moses H. Cone, 460 U.S. at 21 n.23.  For instance, in Sam Reisfeld & Son Import Co. v. S. A. Eteco, 530 F.2d 679 (5th Cir. 1976), the United States Court of Appeals for the Fifth Circuit held that where the charges against parent companies of the arbitrating party "were based on the same operative facts and were inherently inseparable from the claims against [the subsidiary]," the trial court had discretion to stay the claims against the parent pending arbitration against the subsidiary.  As the court explained, "[i]f the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."  Id. at 681.

piercing the veil theory before obtaining a judgment that the subsidiary is liable.  These cases do not address the central issue at hand.  There may be situations in which there is no arbitration clause and a plaintiff can pursue the parent directly on a piercing the veil theory, without first separately showing the subsidiary's liability.  See, e.g., Brown v. Astro Holdings, Inc., 385 F. Supp. 2d 519 (E.D. Pa. 2005).  None of the cases cited by the parties, however, concerned a situation in which the plaintiff was obligated to arbitrate its disputes with the subsidiary but brought suit only against the parent, and the Court has found no such cases.

The plaintiff protests that it would be unreasonable to expect it to proceed to judgment in an arbitration against a judgment-proof entity incorporated in an asset-protection jurisdiction.  The Court disagrees.  If AGK had won in arbitration against ZTI, it could then have sued the defendants on a piercing the veil theory to enforce that judgment.  The parties could then have litigated the issue of whether that veil-piercing suit fell under the arbitration clause.  If AGK had lost in arbitration against ZTI, AGK readily agrees that it would not be able to bring at least some of the claims alleged in the instant suit.  Tr. Oral Arg. at 18, 38, 40-41.

The arbitrators themselves suggested a potential solution to AGK's claim that it should not be forced to pursue

arbitration against ZTI without any prospect of being able to hold a non-judgment-proof entity liable.  In their decision denying AGK's request to join the defendants as respondents in the arbitration, the arbitrators contemplated that a separate arbitration panel could have determined whether or not any claims by AGK against the defendants were arbitrable.  Ex. OO ¶ 23; Tr. Oral Arg. at 31.

E.   The Plaintiff Must Arbitrate All Claims That Rely on Contract 11204

Based on a similar analysis, any claims that rest on or require interpreting Contract 11204 are also arbitrable.

Once a court has determined that an agreement to arbitrate exists, it should find a particular dispute arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  Medtronic, 247 F.3d at 55 (internal quotations omitted).  A party's claim that a particular dispute is arbitrable need be only "plausible" for the court to hold that an arbitrator should decide the question.  Id. Moreover, in determining whether a claim falls within the scope of the arbitration agreement, the Court must focus on "the factual underpinnings of the claim rather than the legal theory alleged in the complaint."  Id.

The Court must give effect to the arbitration clause's

breadth.  The contract reads:  "[i]n the event of disputes Arbitration Rules of the American Arbitration Association in New York will apply."  This clause is not fatally ambiguous, as the plaintiff urges.  This is a broad arbitration clause, at least plausibly encompassing all disputes that relate to the subject matter of the contract.

The plaintiff argues that ZTC is directly liable under Contract 11204 as the named consignee in that contract. Arbitration is mandatory for those claims.  If the plaintiff is going to rely on Contract 11204 for recovery, then it cannot avoid the enforcement of the arbitration clause that Contract 11204 contains.  The plaintiff's direct contract claims, counts 2 and 5, must therefore be arbitrated.[13]

Counts 1 and 4 allege that the plaintiff had an oral contract with the defendants.  In count 1, which concerns Tranche 1, the plaintiff alleges that "'Contract' 11204 . . . incorporates some of the parties['] agreement on terms . . . , while unilaterally changing other terms . . . ."  The plaintiff makes a similar allegation with respect to Tranche 2 in count 4. The plaintiff also alleges that the parties had agreed to treat

---

[13]    The plaintiff urges that its complaint includes the non-contract claim of conversion.  Although there is no separate count of conversion, the plaintiff uses the term "converted" in counts 2, 4, and 5.  Compl. ¶¶ 69, 91, 97, 107.  To the extent that these counts articulate non-contract conversion claims, the Court's analysis in Section II.F. below applies.

the airway bills the same as Tranche 2 and that the plaintiff
would sell the defendants its entire 2003 vanilla output.
Because both counts 1 and 4 require adjudication of the meaning
of Contract 11204 and to what extent its terms reflected the
parties' intentions, these counts must be arbitrated.  Compl. ¶¶
60, 87, 22, 86.


     F.   The Plaintiff Must Arbitrate All Claims Related to the
        Subject Matter of Contract 11204

     The Court concludes that the scope of the plaintiff's
consent to arbitrate is broad enough to encompass all of its
claims, including the unjust enrichment claims in counts 3 and 6.

     The plaintiff argues that because counts 3 and 6
articulate a completely non-contract claim against the
defendants, they should not be affected by AGK's previous
arbitration against ZTI.  In particular, AGK urges that the
defendants are liable directly, not through ZTI, for keeping the
vanilla beans rather than returning them to AGK.

     Because Contract 11204 purports to set forth the terms
under which AGK shipped the vanilla, however, these claims, too,
must be submitted to an arbitrator.  Under Medtronic, the factual
allegations on which a claim rests, not the claim's legal label,
determine whether the claim is arbitrable.  Medtronic, 247 F.3d
at 55; cf. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,
Inc., 473 U.S. 614, 625 n.13 (1985) ("[I]nsofar as the

allegations underlying the statutory claims touch matters covered by the enumerated articles, the Court of Appeals properly resolved any doubts in favor of arbitrability.").

Where separate tort claims arise out of the same facts as the breach of contract claim, a broadly worded arbitration provision covers such claims.  Although the United States Court of Appeals for the Third Circuit does not appear to have addressed this particular aspect of the scope of an arbitration clause, other courts have held unjust enrichment and conversion claims to be arbitrable.  See, e.g., U.S. Claims, Inc. v. Saffren & Weinberg, LLP, Civ. No. 07-0543, 2007 WL 4225536, at *7 (E.D. Pa. Nov. 29, 2007); RCM Techs., Inc. v. Brignik Tech., Inc., 137 F. Supp. 2d 550, 556 (D.N.J. 2001); cf. Brayman Const. Corp. v. Home Ins. Co., 319 F.3d 622, 625-26 (3d Cir. 2003).

G.   The Court Will Stay the Case

The defendant moves for this Court to dismiss the case, or in the alternative to stay proceedings pending arbitration. The Court will stay the case.

Under the FAA, if a suit is brought on an issue "referable to arbitration under an agreement in writing for such arbitration," then "the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the

agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."  9 U.S.C. § 3.

The United States Court of Appeals for the Third Circuit has held that the FAA leaves no discretion to dismiss a fully arbitrable case instead of granting a stay, if a party has requested a stay.  Lloyd v. Hovensa, LLC, 369 F.3d 263, 269 (3d Cir. 2004).[14]  As the Lloyd court notes, even where all claims in a case are arbitrable, a district court retains many roles, including the ability to confirm, vacate, or modify the ultimate arbitration order.  Id. at 270 (citing FAA, 9 U.S.C. §§ 9-11); see also Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193, 201-02 (2000) (stating that any court with the power to stay a suit pending arbitration would have the power to confirm, vacate, or deny any ultimate arbitration award, regardless of whether the arbitration occurred in that court's district).

Lloyd concerned a case in which a party moved for a stay, but the district court instead dismissed the case.  Here, the defendants would prefer a dismissal, but have moved for a stay in the alternative.  The question arises whether this factor would allow the court to dismiss instead of staying the case.

District courts in this circuit have uniformly held

---

[14]   The defendants are not in default in proceeding with arbitration.  "Default" for the purpose of § 3 is generally treated as synonymous with having waived the right to arbitrate by actively litigating the case in court.  Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207, 217-18 (3d Cir. 2007).

post-Lloyd that when a litigant moves for a stay even as part of

a motion in the alternative, Lloyd's mandate applies.  See, e.g.,

Bloom v. Jersey City Mun. Utils. Auth., No. 06-CV-3526, 2008 WL

360986, at *6 (D.N.J. Feb. 8, 2008) (ruling on motions for

summary judgment, motions to dismiss, and a motion to stay by

only one of multiple defendants, the court has no choice but to

stay); U.S. Claims, 2007 WL 4225536, at *14 (ruling on a motion

to dismiss or in the alternative to stay the suit, the court has

no choice but to stay); Griffen v. Alpha Phi Alpha, Inc., No.

Civ. A. 06-1735, 2007 WL 707364, at *9 (E.D. Pa. Mar. 2, 2007)

(same).

On the other hand, when a party has moved for a

dismissal but has not moved for a stay, some courts have ruled

that Lloyd does not apply and therefore that a dismissal is

available if all claims in the suit are arbitrable.  See, e.g.,

Rhodia Inc. v. Bayer Cropscience Inc., No. Civ. 04-6424, 2007 WL

3349453, at *5 (D.N.J. Nov. 7, 2007).[15]

The Court need not decide whether a stay is mandatory

here because even if a stay were not mandatory under the FAA, the

---

[15]   If a party that is not subject to arbitration applies
for a stay, the court has the discretion but not the obligation
to stay the litigation as to that party, in order to allow other
claims in a suit to go to arbitration first.  See Moses H. Cone,
460 U.S. at 21 n.23.  This Court has ruled that the defendants
can enforce the arbitration agreement against the plaintiff even
though they are not signatories to the arbitration agreement.
This principle, therefore, does not apply here.

Court would exercise its discretion to stay the case pending
arbitration because the Court retains many roles in connection
with an arbitration.  Even if some but not all of the claims in
this case were arbitrable, the Court would stay the entire case
pending arbitration because the factual bases for all of the
claims are so intertwined with one another.  The fact that
arbitration was previously commenced but never concluded does not
change the Court's finding that a stay is warranted.[16]

        The Court does not reach the defendants' other
arguments in support of its motion to dismiss.


        An appropriate Order follows.

---

        [16]    The Supreme Court encountered a case in which
arbitration proceedings had been suspended in <u>Mitsubishi Motors</u>,
473 U.S. 614, in which the Court found the dispute in question
arbitrable.  The district court had stayed its own proceedings
pending arbitration in Japan that subsequently halted when one
party filed for bankruptcy.  <u>Id.</u> at 623 n.12.  The question of
how the district court should handle the stay in the face of the
halted arbitration proceedings was not, however, before the
Supreme Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

A.G.K. SARL                  :    CIVIL ACTION
                             :
        v.                   :
                             :
A.M. TODD COMPANY, et al.    :    NO. 07-2727

ORDER

AND NOW, this 18th day of March, 2008, upon consideration of the defendants' Motion to Dismiss, or in the Alternative to Change Venue (Docket No. 12), the plaintiff's opposition thereto, the defendants' reply thereto, and the parties' supplemental submissions, and following oral argument held on November 1, 2007, IT IS HEREBY ORDERED that the motion to dismiss or stay is GRANTED, and that the motion to change venue is DENIED as MOOT, for the reasons stated in the accompanying memorandum.

IT IS FURTHER ORDERED that these proceedings are STAYED until further notice by the Court.  The parties shall report back to the Court within 90 days of the entry of this Order as to the status of this matter.

BY THE COURT:

/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.